UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                  :

CAR CHARGING GROUP, INC.,             :
CAR CHARGING, INC., 350 HOLDINGS  :
LLC AND  350 GREEN, LLC,         :

           :

      Plaintiffs,       :              ECF Case

           :      No. 1:13-CV-08755-KPF

   v.                 :

           :

MARIANA V. GERZANYCH AND TIMOTHY L.:
MASON,                             :

           :

           :

      Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

**DLA PIPER LLP (US)**
Cary Samowitz
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500
cary.samowitz@dlapiper.com

Frank T. Pepler
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
(415) 836-2500
frank.pepler@dlapiper.com
*Admitted Pro Hac*

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.   THE RELEASE ................................................................................................. 1

    A.   Background to Release ............................................................................. 2

    B.   Fraudulent Inducement Is Barred Where a Written Contract Exists .................... 4

    C.   Fraudulent Inducement Does Not Void Release ............................................ 4

    D.   The Release Should be Broadly Construed ................................................. 5

    E.   Dismissal Under Federal Rule 12(b)(6) is Appropriate Based on Prior Release ......................................................................................... 6

    F.   Application and Argument ...................................................................... 6

II.  EVEN IF THE RELEASE WERE NOT DISPOSITIVE, PLAINTIFFS COMPLAINT SHOULD BE DISMISSED AS A MATTER OF LAW .......................... 7

    A.   Defendants Made No Representation as to Liabilities: 350Green Did ................. 8

    B.   Limiting 350Green's Knowledge Does Not Expose Defendants to Liability ................................................................................................. 9

    C.   Defendants' Representation ................................................................... 9

    D.   The JNS Deal .................................................................................... 10

    E.   Knowledge Timeline ........................................................................... 11

    F.   Scope of 350Green Disclosure ............................................................... 14

    G.   Disclosed Context of the Release ........................................................... 16

    H.   Facts Undisclosed by Plaintiffs in the December Complaint But Known by Plaintiffs ......................................................................................... 18

        1.   CCGI's Public Filings Disclose Lack of Standing, Damages .................. 19

            (a)   CCGI Has Not Paid Defendants What They Are Owed ............. 20

            (b)   350Green's Rights Were Assigned to a Mortgage Trust in April 2014 ...................................................................... 20

            (c)   350Green is Not Paying Creditors ........................................ 21

III. LEGAL STANDARD FOR MOTION TO DISMISS ................................................ 22

IV.  CONCLUSION .............................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................22

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1990) .............................................................................18, 22

*Bell Atlantic v. Twombly*,
550 U.S. 544 (2007) .................................................................................................22

*Caballero v. Phoenix Am. Holdings, Inc.*,
79 So. 3d 106 (Fla. Dist. Ct. App. 2012) .................................................................5

*Cerniglia v. Cerniglia*,
679 So. 2d 1160 (Fla. 1996) ...................................................................................10

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991) .........................................................................14, 15, 18

*Eclipse Medical, Inc. v. Am. Hydro-Surgical Instruments, Inc.*,
262 F. Supp. 2d 1334 (S.D. Fla. 1999) .....................................................................4

*Fote v. Reitano*,
46 So. 2d 891 (Fla. 1950) .........................................................................................5

*Hancoy Holding Co. v. Lambright*,
101 Fla. 128  (1931) .................................................................................................5

*Hardage Enters., Inc.v. Fidesys Corp, N.V.*,
570 So. 2d 436 (Fla. Dist. Ct. App. 1990) ...............................................................6

*Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd.*,
620 F.3d 137 (2d Cir. 2010) .................................................................................6, 23

*Kelly-Brown v. Winfrey*,
717 F.3d 295 (2d Cir. 2013) .................................................................................6, 23

*Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*,
761 So. 2d 306 (Fla. 2001) .......................................................................................4

*Kobatake v. E.I. DuPont De Nemours & Co.*,
162 F.3d 619 (11th Cir.1998) ...................................................................................4

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001) ......................................................................22

*Pani v. Empire Blue Cross Blue Shield*,
  152 F.3d 67 (2d Cir. 1998)) ...................................................................6, 23

*Patrowicz v. Transamerica HomeFirst, Inc.*,
  359 F. Supp. 2d 140 (D. Conn. 2005) ...................................................6, 23

*Peebles v. Sheridan Healthcare, Inc.*,
  853 So. 2d 559 (Fla. Dist. Ct. App. 2003) .................................................5

*Perfumania Holding Corp. v. XL/Datacomp, Inc.*,
  605 So. 2d 976 (Fla. Dist. Ct. App. 1992) .................................................5

*S. Rd. Associates v. Int'l Bus. Machines Corp.*,
  216 F.3d 251 (2d Cir. 2000) ......................................................................22

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) ..................................................................18, 22

*Sutton v. Crane*,
  101 So. 2d 823 (Fla. Dist. Ct. App. 1958) .................................................5

*Warren v. Fox Family Worldwide, Inc.*,
  328 F.3d 1136, 1139 (9th Cir. 2003) .......................................................22

## STATUTES

Fed. R. Civ. P. 8(c) ............................................................................6, 23

Fed. R. Civ. P. 9(b) ................................................................................10

Fed. R. Civ. P. 12(b)(6) ................................................................... *passim*

This Motion to Dismiss is brought by Defendants Timothy Mason and Mariana Gerzanych because all but one of the causes of action asserted by Plaintiffs in their First Amended Complaint were released by Plaintiffs in a negotiated settlement of their April 2013 action against Defendants. Defendants therefore respectfully request that the Court dismiss all claims and causes of action asserted by Plaintiffs in the instant action, excepting only Claim VI against Defendant Timothy Mason.

## I.   <u>THE RELEASE.</u>

All claims brought by Plaintiffs against Defendants jointly should be dismissed without further proceedings.  The same parties were before Judge Furman of this Court on virtually identical claims.  On April 10, 2013, Plaintiffs Car Charging Group, Inc. ("**CCGI**") and 350 Green Holdings, LLC ("**CCGI Sub**") sued Defendants on the same claims in Civil Case No. 13-CIV-2389 (the "**April Action**" and "**April Complaint**").  Twelve days after the April Action was filed, Plaintiffs' claims were fully resolved as against Defendants by settlement.  The resolution as against Defendants was complete, without prejudice to CCGI and CCGI Sub continuing to litigate with third party defendant JNS Holdings, Inc. regarding whether JNS or 350Green, LLC owned the "Chicago Assets" described in the April Complaint.  CCGI and CCGI Sub, on the one hand, and 350Green, Mr. Mason and Ms. Gerzanych, on the other, executed an "Addendum to Equity Exchange Agreement" dated April 22, 2013 ("**Addendum**") containing the following release language (the "**Release**"):

> CCGI does hereby release with prejudice and forever discharge 350[Green] and the 350 Members [Mason, Gerzanych], their agents, employees, successors, and assigns, and their respective heirs, personal representatives, affiliates, successors and assigns, from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature whatsoever which CCGI may now have or may hereafter have, arising out of or in any way relating to any and all injuries and damages of any and every kind that may develop in the future, as a result of or in any way relating to:  (x) the NY Litigation

against 350 and the 350 Members; (y) the 350 and 350 Members'
discussions with JNS, or any contract for the sale of the Chicago
Assets to JNS.  (First Amended Complaint ("FAC"), Exhibit B, p. 4).

Plaintiffs allege that the Release is void because it was induced by fraud.  However, the allegedly

fraudulent fact representations on which Plaintiffs rely are fully integrated into the Addendum.

Under Florida law, once allegedly fraudulent fact representations are integrated into a written

agreement, Plaintiffs' fraudulent inducement claims are barred as a matter of law.  Plaintiffs are left

with breach of contract claims, and the contract at issue contains the Release.

> **A.** **Background to Release.**

Plaintiffs CCGI, CCGI Sub, Car Charging Group, and Defendants' former company

350Green, LLC ("**350Green**") filed their complaint commencing Case No. 13-CIV-08755-KPF in

December of 2013 (the "**December Action**" and "**December Complaint**").  The December

Complaint repeats verbatim most of the allegations contained in CCGI and CCGI Sub's April

Complaint and both arise from the same transaction:  Defendants' exchanged 100% of their

membership interests in 350Green for a combination of restricted stock in CCGI and a promissory

note made by CCGI Sub and guaranteed by CCGI (the "**CCGI Deal**").  The CCGI Deal was

evidenced by an Equity Exchange Agreement dated March 8, 2013 ("**Exchange Agreement**"), as

amended by the Addendum of April 22, 2013.  Both the Exchange Agreement and Addendum

contained integration clauses cutting off claims of representations made outside of the agreements.

FAC Exhibit B, p. 6 of 10, § 12; Request for Judicial Notice ("RJN") Exhibit A, Exhibit C, p. 22 of

22, § 8.5.

Although the December Action is against Mr. Mason and Ms. Gerzanych as individuals (the

April Action was against both them and 350Green), the December Complaint alleges breach by Mr.

Mason and Ms. Gerzanych of the same Exchange Agreement that was the subject of the April

Action.  The December Action adds Defendants' alleged breach of the Addendum that the parties

signed to settle the April Action, and it adds claims for fraudulent inducement, conspiracy to commit fraud and equitable requests for relief in an apparent effort to plead around the Release.[1]   Both Plaintiffs' breach of contract claims and tort claims are tied to what they allege were fraudulent misrepresentations by Mr. Mason and Ms. Gerzanych in the Exchange Agreement and Addendum. FAC ¶ 25 ("Defendants represented that the amount of outstanding vendor liabilities related to the Chicago Project was $1,582,337.44"); ¶ 53 ("The $1,617,040.73 that Defendants represented in the APA is $243,245.61 more than Defendants represented was the amount of liabilities in the Exchange Agreement"); ¶ 55 ("The blatant misrepresentations by Defendants regarding the value [sic] of 350 Green's outstanding liabilities …"); ¶ 56 ("above the amount that the Defendants represented in the Exchange Agreement and First Addendum"); ¶ 60 ("Section 2.12 of the Exchange Agreement states that Defendants had no knowledge of any liabilities other than those disclosed on Schedule 2.12(a)"); ¶ 62 ("Defendants' [sic] breached Section 2.12 of the Exchange Agreement when they sold the Chicago Project which assets that had [sic] accompanying liabilities in the amount of $2,126,290.28").

Defendants made no representations regarding the financial condition of 350Green, only 350Green did so.  RJN Exhibit C, Exhibit A, Article II.  To the extent that Plaintiffs allege that the Exchange Agreement was breached by failure of 350Green's representations to be true and correct as and when made, they have breach of contract claims subject to the Defendants' assertion of the Release, which remains unaffected by allegations of fraudulent inducement.  Florida law is clear that Plaintiffs cannot use the sleight of hand of alleging fraudulent inducement to ignore their contracts. Here, the Release is an integrated provision of the CCGI Deal and enforcement of the Release

---

[1] The general allegations in the December Complaint repeat the April Complaint's iteration of facts regarding the purchase by JNS Holdings, Inc. of the "Chicago Assets" from 350Green on or about April 17, 2013 (the "**JNS Deal**"). FAC Exhibit B, ¶¶ 31, 37, *et seq.*

disposes of Plaintiffs' claims in full.

**B.      Fraudulent Inducement Is Barred Where a Written Contract Exists.**

The Exchange Agreement and Addendum are governed by Florida law.  FAC  Exhibit B, p. 6 of 10, ¶ 14; RJN Exhibit C, Exhibit  A, p. 23 of 22 [sic], § 8.11.  Under Florida law, "no action for fraud in the inducement will lie where the alleged fraud contradicts the subsequent written contract …. [and] reliance on fraudulent representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement." *Eclipse Medical, Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 1999) (citing cases).   All of the misrepresentations that Plaintiffs allege are either before the date that those representations were integrated into the Exchange Agreement and Addendum, or are representations actually contained in those written agreements.  Because of that integration, and the availability of breach of contract as a remedy as pleaded in Count I of the December Complaint, Plaintiffs' fraudulent inducement claims are barred as a matter of law.

**C.      Fraudulent Inducement Does Not Void Release.**

Notwithstanding Florida law and the clear meaning of the Release, Plaintiffs attempt to plead around the Release by asserting that the Exchange Agreement, Addendum and Release were obtained through Defendants' fraud.  Plaintiffs' assertion does not hold up under Florida law.  Like most states,  "Florida courts enforce general releases to further the policy of encouraging settlements.  Numerous Florida cases have upheld general releases, even when the releasing party was unaware of the defect at the time the agreement was executed." *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306 (Fla.  2000) (citing cases).  Indeed, Florida law favoring resolution through settlement recognizes the finality and binding effect of releases "even in the face of a fraudulent inducement claim." *Id.* In *Kobatake v. E.I. DuPont De Nemours & Co.*, 162 F.3d 619, 625 (11th Cir.1998), the court held that the "execution of such all-encompassing releases prohibits [plaintiffs]

from suing defendants [for fraudulent inducement]."  A release cannot be undone simply by alleging

fraudulent inducement where the alleging party was on notice of the truth:  "If, after a representation

of fact however positive, the party to whom it was made institutes an inquiry for himself and actually

learns the real facts, he cannot claim to have relied upon the misrepresentation and to have been

misled by it." *Hancoy Holding Co. v. Lambright*, 101 Fla. 128, 135 (1931). Where an experienced

businessperson is granted full access to the records in which the alleged misrepresentations lie, that

"every person must use reasonable diligence for his own protection."  *Fote v. Reitano*, 46 So.  2d

891, 892 (Fla. 1950).  Under Florida law, "he who will not reasonably guard his own interest when

he has reasonable opportunity to do so, and there is no circumstance reasonably calculated to deter

him from improving such opportunity, must take the consequences."  *Sutton v. Crane*, 101 So. 2d

823, 826 (Fla. Dist. Ct. App. 1958).

## D.    The Release Should be Broadly Construed.

Florida law further provides that the language of claims releases is broadly construed to bar

claims based on prerelease conduct.  *Caballero v. Phoenix Am. Holdings, Inc.,* 79 So. 3d 106 (Fla.

Dist. Ct. App. 2012) (holding that a general release exonerated employer as to employee's claims of

retaliatory discharge, breach of contract, fraudulent inducement, unjust enrichment, and promissory

estoppel); *Peebles v. Sheridan Healthcare, Inc.,* 853 So.  2d 559 (Fla. Dist. Ct. App. 2003)  (holding

that action by anesthesiologists who sold their practice to a management company, against former

president of practice and management company, alleging fraud in the inducement, securities

violations, and conspiracy to breach fiduciary duty was precluded by stock purchase agreement and

releases); *Cerniglia v. Cerniglia,* 679 So. 2d 1160 (Fla. 1996); *Perfumania Holding Corp. v.

XL/Datacomp, Inc.,* 605 So. 2d 976 (Fla. Dist. Ct. App. 1992) (construing broadly "arising from or

related to" language in a release between commercial buyer and seller of computer equipment);

*Hardage Enters. Inc. v. Fidesys Corp, N.V.,* 570 So. 2d 436 (Fla. Dist. Ct. App. 1990) (construing

broadly "any and all claims . . ." language in a release that ended a dispute arising from a construction management contract).

### E.   Dismissal Under Federal Rule 12(b)(6) is Appropriate Based on Prior Release

Although the effect of the prior release may be plead as an affirmative defense by the released party under Fed. R. Civ. P. 8(c) to a post-release action brought by the releasing party, the law is also clear that a release may be raised on an affirmative motion by the benefitted party.  Under Federal procedural law, the Court can adjudicate affirmative defenses on a motion to dismiss under Rule 12(b)(6) where the facts necessary to establish the defense are evident on the face of the complaint.  *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (adjudicating the affirmative defense of fair use to resolve a motion to dismiss a trademark dispute); *see also Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137 (2d Cir. 2010) (upholding dismissal of securities fraud action on basis of affirmative defense of absence of loss causation); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) (surveying opinions adjudicating various affirmative defenses to resolve motions to dismiss). This principle is applied to bar claims subject to a written release.  *See, e.g., Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005) ("The defense of res judicata *or release* may be raised on a Rule 12(b)(6) motion to dismiss if all relevant facts are shown by the court's own records." ) (internal quotation and citation omitted, emphasis added).

### F.   Application and Argument.

Both as a matter of Florida claim preclusion law and as a matter of specific application of that law to Plaintiffs' claims against Defendants, the Release bars all but the Sixth Count in the First Amended Complaint.

Plaintiffs had ample opportunity to protect themselves from any potential harm caused by the quality of 350Green's recordkeeping, both before and after they acquired 350Green.   The First

Amended Complaint makes repeated reference to Plaintiffs' thorough preclosing due diligence. FAC ¶ 23 (Exchange Agreement signed only after "extensive period of due diligence and negotiation"); ¶ 66 ("CCGI and 350 Holdings later discovered during their due diligence prior to acquisition of 350 Green"); ¶ 69 ("Between July, 2012 and April, CCGI performed its due diligence."). The Exchange Agreement and Addendum also provided Plaintiffs with post-closing audit rights, because as Plaintiffs and Defendants acknowledged in the Exchange Agreement, 350Green's books "have not been prepared in accordance with generally accepted accounting principles in the United States of America."  RJN Exhibit C, Exhibit A, p. 6 of 22, § 2.9.1; FAC Exhibit B, ¶ 4.  Due to the admitted low quality of the financial information received pre-closing, the agreements provided that post-closing, when Plaintiffs had unlimited access to 350Green's books and records, if within 71 days after the closing Plaintiffs found the records and information inadequate or un-auditable, the Exchange Agreement and Addendum could be terminated.  *Id.*

Plaintiffs' current breach of contract action evidences their waiver of their post-closing right to terminate and their election of contract damages.  The Exchange Agreement and Addendum remain in effect, and the integrated contract formed by those documents contains the Release.  The Release bars all claims arising before April 22, 2013 related to the April Action and the Chicago contract.  Accordingly, Defendants request that Counts I, II, III, IV and V of the First Amended Complaint be dismissed.

## II.    **<u>EVEN IF THE RELEASE WERE NOT DISPOSITIVE, PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED AS A MATTER OF LAW</u>**

Defendants bargained for the Release and respectfully suggest that under Florida law the Release bars Plaintiffs' current action.  Even absent the Release, however, Defendants believe that the First Amended Complaint and related documents provide ample basis for dismissal of all claims against Defendants other than Cause VI against Mr. Mason, which Defendants will defend on the

merits.

**A.      Defendants Made No Representation as to Liabilities: 350Green Did.**

The First Amended Complaint misconstrues the Exchange Agreement on which Plaintiffs'
entire theory of recovery is based.  Both Defendants and (now) Plaintiff 350Green are parties to the
Exchange Agreement and Addendum.  However, the roles of 350Green and Defendants are not
fungible.  Defendants owned 100% of the membership interests in 350Green.  350Green in turn
owned the electric vehicle charging stations, contract rights and other property that constituted the
operating business assets that gave value to the membership interests owned by Defendants.  The
representations, warranties and covenant obligations of Defendants and 350Green were accordingly
segregated according to the property interests that each party owned.   All of Plaintiffs'
misrepresentation allegations against Defendants rest on Article II of the Exchange Agreement.
Article II is titled "Representations and Warranties *of 350 [Green]*." (emphasis added.)   In contrast,
Article III of the Exchange Agreement is titled "Representations and Warranties of 350 Members,"
that is, Defendants.

Every representation in Article II of the Exchange Agreement begins consistently with the
language "350 represents, warrants and agrees that all of the statements in all of the following
subsections of this entire Article II are true and complete as of the date hereof."  RJN Exhibit C,
Exhibit A, p. 3 of 22 (filed contemporaneously herewith).  Each subsection of Article II contains
similar language:  "350 is a limited liability company" (§ 2.1.1); "350 does not directly or indirectly
own" (§ 2.3); "350 has all corporate power" (§ 2.4).  Plaintiffs focus on Section 2.12 of the
Representations and Warranties of 350 and, by ignoring some words and implying others, attempt to
impose strict liability on Defendants on a dollar-for-dollar basis for any 350Green liabilities
"connected with the Chicago Project" in excess of the liabilities shown on Schedule 2.12(a) which
Plaintiffs – not Defendants – allege are related to the Chicago project.  FAC ¶¶ 61, 62, 74, 76, *et al.*

-8-

The actual language of Section 2.12 is as follows:

> Except as disclosed on <u>Schedule 2.12(a)</u> as an Account Payable, disclosed as a liability on the financial statements attached as <u>Schedule 2.9</u> or deemed to be unearned revenues or grants as listed on <u>Schedule 2.12(b)</u> *to 350's knowledge* upon the Closing Date, 350 will have no debt, obligations of liabilities.  (underlined emphasis added).

Again, there is no statement or representation made by Defendants in Section 2.12, and even 350Green's representation has three schedules of exceptions and a knowledge qualifier.  Moreover, 350Green's representations are not "clean" and unqualified, but are instead qualified and limited to the knowledge of 350Green on the Closing Date, and are further limited by identification of a specific and limited universe of individuals within 350Green whose knowledge matters: the knowledge of Timothy Mason and Mariana Gerzanych.

### B.     Limiting 350Green's Knowledge Does Not Expose Defendants to Liability

Potential liability of 350Green in respect of the representation and warranties given in Section 2.12 is limited not only by the knowledge qualifier in Section 2.12 itself, but also by the limitation of the scope of 350Green's attributable knowledge to "the actual current knowledge of Mariana Gerzanych and/or Timothy Mason."   RJN Exhibit C, Exhibit A, p. 3 of 22, Article II. Plaintiffs allege that this language, intended to further limit the representation of 350Green, implicitly binds Defendants as if they guaranteed the accuracy of 350Green's representations in Article II.  It does not.

### C.     Defendants' Representations.

Article III of the Exchange Agreement addresses representations and warranties made by Defendants.  These representations are limited to the authority of each Defendant to transact and to deliver their membership interests in 350Green to CCGI Sub (§ 3.1), the lack of conflict between Defendants' obligations under the Exchange Agreement and other agreements to which they are parties (§ 3.2), and then a series of six representations made by each Defendant to support their

receipt of the unregistered and restricted shares of CCGI to be issued to Defendants under the Exchange Agreement (§§ 3.4–3.8).  Article III contains no representations by Defendants concerning the assets or liabilities of 350Green.

####    D.    The JNS Deal.

Plaintiffs devote pages in the First Amended Complaint to alleging that they did not know about the "JNS Deal" until after March 22, 2013,[2] and further pages to their view of justice officials' investigations of Mr. Mason and Ms. Gerzanych related to Federal grants and the operations of 350Green.  Based on the pleadings and requests for relief, Defendants assert that none of Plaintiffs' assertions about the JNS Deal or Federal justice or FBI inquiry is relevant to the relief that they seek against Defendants.[3]

But Plaintiffs' denial of earlier knowledge is directly undercut by their own April Complaint and the Declaration of Michael D. Farkas, Chief Executive Officer of Car Charging Group, Inc., by Order to Show Cause, In Support of Plaintiffs' Motion for Injunctive Relief.  RJN Exhibit B, p. 6, ¶ 22 ("On February 11, 2013 a press release was issued by Defendant JNS Holdings Corporation ('JNS') announcing that JNS has entered into a Formal Letter of Intent with 350 Green to acquire"

---

[2] The allegations in the December Complaint are strangely passive in terms of who knew what and when they knew it.  This lack of specificity is especially problematic because fraud allegations must be plead with specificity under Fed. R. Civ. P. 9(b).  For example:  "*It was then learned* that Defendants … had been in contact with representatives from JNS Holding Corp. ('JNS Holdings') in an effort to sell the assets related to the Chicago Project."  FAC ¶ 31 (emphasis added).  Similarly "*it was discovered* that on April 17, 2013, 350 Green and JNS Power & Holdings, Inc. … entered into an Asset Purchase Agreement."  *Id.,* ¶ 37 (emphasis added).  "*It was further learned* that the closing of the APA was set to take place on April 29, 2013."  *Id.* (emphasis added).  These allegations fail to identify whether any of the CCGI parties were among the persons who "then learned" of the potential JNS Holdings Deal.  The April Action is clear that CCGI's Chief Executive Officer knew about the JNS Holdings deal as early as February and certainly before April 22, 2013.

[3] Defendants do not believe it relevant to disposition of the December Action but wish to disclose to the Court that on March 3, 2015, Grand Jury Indictments against Mr. Mason and Ms. Gerzanych were filed in the United States District Court for the Northern District of Illinois, Eastern Division as Case No. 15-CR-102.  Defendants have retained counsel in that action who has made appearances on their behalf.  Certain of the allegations contained in the indictments may relate to Defendants' operation of 350Green and the Chicago Project.

the Chicago Project).  The April Action ties Plaintiffs' knowledge of the JNS Deal all the way back to February 2013, both before the Exchange Agreement and before the April 22, 2013 Addendum. Plaintiffs had knowledge in February of the JNS Deal, and acknowledge themselves that the JNS Deal was documented on April 17, 2013, (FAC ¶ 17) and closed soon thereafter.  *Id.*  However, when Plaintiffs signed the Addendum on April 22, 2013, they gave Defendants broad claims releases to induce Defendants to transfer their membership interests in 350Green to CCGI Sub in exchange for restricted stock of CCGI and a promise to pay cash made by CCGI Sub and CCGI (the "CCGI Deal").[4]

###         E.        Knowledge Timeline.

Because the Release bars all claims before April 22, identifying *when* Plaintiffs knew about the nondisclosures they now complain of is essential to interpreting the scope and binding effect of their release of Defendants.  Similarly, *what* the Plaintiffs knew in 2012 that they now complain was hidden from them in 2013 is critical.  As to timing, key dates include:

**June of 2012**:  The month Plaintiffs started "extensive" due diligence on the CCGI Deal.[5]

**April 16, 2012**:  The date on which vendor Efacec gave notice to 350Green that Efacec was terminating its charging station supply agreement, asserting termination damages in excess of $2,000,000.[6]

**September 11, 2012**:  The date on which counsel for Efacec gave notice to counsel for

---

[4]  CCGI's CEO declares:  "On February 11, 2013 a press release was issued by Defendant JNS Holdings Corporation ("JNS") announcing that JNS had entered into a Formal Letter of Intent with 350Green to acquire certain assets which consists [sic] of the Chicago area Grant Agreement, only."  RJN Exhibit B, Declaration of Michael D. Farkas, CEO of Car Charging Group, By Order to Show Cause, in Support of Plaintiffs' Motion for Injunctive Relief ("Farkas Decl.") ¶ 22.  Indeed, the entire purpose of the April Action was to enjoin the closing of the very JNS Holdings Deal disclosed to CCGI on February 11 that the December Action then alleges Plaintiffs did not know about until sometime after March 22.

[5]  Farkas Decl., ¶ 4.

[6]  Declaration of Frank T. Pepler in Support of Defendants Motion to Dismiss, Exhibit A ("Pepler Decl.").

350Green that Efacec asserted termination damages against 350Green in excess of $2,000,000.[7]

**November 2, 2012**:  The date on which the Chief Executive Officer of CCGI, Michael D. Farkas, wrote directly to counsel for Efacec offering to resolve Efacec's termination damage claim against 350Green.[8]

**February 11, 2013**:  The date when, eight months into their extensive due diligence, Plaintiffs learned that 350Green was pursuing a "JNS Deal".[9]

**March 8, 2013**:  The date the Exchange Agreement evidencing the CCGI Deal was executed by Plaintiffs, Defendants and 350Green.[10]

**March 22, 2013**:  The scheduled closing of the CCGI Deal.  Also the date CCGI proposed an amendment to the CCGI Deal documents, which Defendants did not accept.[11]

**After March 22, 2013**:  350Green recommenced negotiations on the JNS Holdings Deal.

**April 15, 2013**:  The date Plaintiffs filed the April Action alleging breach of the Exchange Agreement and seeking to enjoin closing of the JNS Deal.  April 29, 2013 was the date set for hearing on Plaintiffs' injunction motion.[12]

**April 15 to April 22, 2013**:  350Green closed the JNS Holdings Deal and transferred the Chicago Assets to JNS.

**April 22, 2013**:  The date Plaintiffs delivered the Release to Defendants, reserving only

---

[7] Pepler Decl., Exhibit B.

[8] Pepler Decl., Exhibit C.

[9] FAC ¶ 22.

[10] *Id*., ¶ 25.

[11] *Id*., ¶¶ 26, 28, 30.  Plaintiffs acknowledge that the United States District Court for the Northern District has rejected the argument they advance again here that the Exchange Agreement was not terminated when rather than submitting signatures CCGI delivered a counteroffer by way of further amendment.  *Id.*, ¶ 51.

[12] *Id*., ¶ 2.

Plaintiffs' claims against JNS Holdings.[13]

**April 22, 2013**:  The date Defendants transferred their membership interests in 350Green to Plaintiffs in exchange for $10,000 in cash, restricted CCGI stock and Plaintiff's promise to pay cash over time.[14]

**December 6, 2013:**  The date Plaintiffs filed the December Complaint asserting breach of the Exchange Agreement and Addendum, together with other claims related to the CCGI Deal and the JNS Deal.[15]

The lynchpin of the December Action is that Defendants – Mr. Mason and Ms. Gerzanych – failed to disclose liabilities of 350Green related to the "Chicago Assets" and the JNS Deal.  The April and December complaints show on their face that Plaintiffs: (i) knew that Efacec asserted claims against 350Green far in excess of the accounts payable due to Efacec for delivered charging stations as shown on Schedule 2.12(a); (ii) knew about the JNS Deal before the proposed CCGI Deal closing date of March 22, 2013; (iii) knew about the JNS Deal and the Efacec liability before April 22, 2013, the closing date of the JNS Deal; (iv) elected to close the CCGI Deal on April 22, 2013, even though Plaintiffs knew the Chicago Assets had been sold to JNS Holdings[16] and that the Efacec dispute with 350Green remained unresolved; (v) elected to release Defendants from any liability related to the

---

[13] Complaint, Exhibit B.

[14] *Id*.  The First Amended Complaint misstates that Defendants were "paid" cash of $500,000 and CCGI Stock worth $750,000.  Neither is true.  From the $1,250,000 Plaintiffs agreed to pay for Defendants' membership interests in 350Green, Plaintiffs have paid them only $140,000.  RJN Exhibit D.

[15] *Id*.

[16] The December Complaint is internally contradictory on this point.  On the one hand, the text alleges that "The Chicago Assets, as well as the liabilities associated with the Chicago Project, were specifically included in the First Addendum to the Exchange Agreement."  FAC ¶ 38.  The Addendum attached as an exhibit to the First Amended Complaint expressly acknowledges the opposite:  "CCGI recognizes that 350 has engaged in discussions and has, in fact, contracted to sell the assets and liabilities of 350 in Chicago, IL … to JNS Holdings."  *Id.*, Exhibit B, p. 3 of 10, § 5.  As discussed in Section I, *infra*, the Exchange Agreement, Addendum and Release control and bar Plaintiffs' claims, no matter how alleged.

April Action, the JNS Deal or the CCGI Deal; and (vi) elected to retain *only* claims and causes of action against JNS Holdings.

>    **F.      Scope of 350Green Disclosure.**

The First Amended Complaint pleads breach of contract, fraud, conspiracy, unjust enrichment and breach of duty, all based on the allegation that "Defendants' (sic) affirmatively represented that the liabilities related to the Chicago Project, at the time the parties negotiated the purchase price, was approximately $1,582.33.44 [sic]." FAC ¶ 73. Brief review shows that nowhere in the Exchange Agreement or the Addendum is there a specific representation by 350Green breaking out the Chicago Project liabilities from any others. Plaintiffs provide no support for their assertions in Exhibit A to the First Amended Complaint, which they contend, without foundation or support, details the alleged misrepresentations made by Defendants in connection with the Chicago Project. Although the "Notes" column refers to "Documents Enclosed" to support some of the assertions, there are no documents attached to Exhibit A to Plaintiffs' First Amended Complaint.

The representations in the Exchange Agreement at no point specifically break out Chicago liabilities from others. Further, 350Green's representations are limited by knowledge qualifiers, and refer to a list of several exceptions. 350Green's representations in Section 2.12 and Schedule 2.12(a) are limited to 350Green's knowledge, and excepts out from 350Green's representation anything on Schedule 2.12(a), Schedule 2.9 or Schedule 2.12(b), together with "any statements or documents incorporated in it by reference" as well as "documents that the plaintiffs either possessed or knew about." The representations made by 350Green can only be construed in light of the information actually supporting those representations. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).

Schedule 2.12(a) does not stand in isolation. Schedule 2.12(a) lists some claims as disputed, and specifically ties others to documents outside the schedule that had been supplied to CCGI.

Further, other schedules such as Schedule 2.7 show certain payables in Schedule 2.12(a) as subject to possible or pending litigation.  For example, Schedule 2.7 recognizes the "demand" made by Efacec as a further litigation liability.  As *Cortec Industries* makes clear, when allegations in a complaint omit information referred to in the complaint, incorporated into the complaint, or information of which the party against whom dismissal is sought has actual knowledge, the Court may consider the full scope of the information in ruling on a motion to dismiss.  This is true even if the information is extrinsic to the Complaint.  *Id.*

Without crediting the accuracy of Exhibit A to Plaintiff's First Amended Complaint, Defendants note that almost all of the alleged discrepancy between what Plaintiffs say they knew about when they entered into the Exchange Agreement and Addendum, and what they assert Defendants hid from them by their nondisclosure in Schedule 2.12(a), relate to a single creditor. That creditor is Efacec, the supplier of charging stations to 350Green that CCGI had directly engaged in settlement discussions in November of 2012.  In the column "Amount in CCGI/350 Equity Exchange Agreement," Plaintiffs allege that Defendants represented in the Exchange Agreement that the Efacec liability was $690,000 when Efacec now claims $2,414,807 is due.  The difference is $1,724,807.  The First Amended Complaint omits disclosing that Plaintiffs were in possession of documents that advised them that Efacec would make claim for far more than a $690,000 outstanding invoice.  Schedule 2.12(a) refers to Efacec's claim is "per Notice of Termination dated August 16, 2012."   The Notice of Termination was provided to CCGI by Defendants in connection with CCGI's due diligence. Pepler Decl., Exhibit A.  Indeed, as Plaintiffs well know, CCGI not only knew that Efacec was asserting termination damages in addition to the $690,000 account payable scheduled by 350Green, 350Green had received further correspondence on September 11, 2012, in which Efacec increased its termination demand still further. Pepler Decl., Exhibit B.  By letter dated

November 2, 2012, CCGI actually negotiated with Efacec – four months before the scheduled Exchange Agreement closing date and five and three quarters months before the Addendum Closing Date -  in an effort to settle Efacec's termination demand before it closed the CCGI Deal.  Pepler Decl., Exhibit C.

CCGI and CCGI Sub signed the Exchange Agreement knowing that (i) the Efacec termination demand was outstanding and remained unresolved; and (ii) the Chicago Assets were under contract to JNS Holdings.

G.    **Disclosed Context of the Release.**

The Release arose from the CCGI Deal evidenced by the March 8, 2013 Exchange Agreement and CCGI's and CCGI Sub's April Action for alleged breach of the Exchange Agreement by Defendants and 350Green, together with related relief against third party JNS.  Under the Exchange Agreement, Defendants were to exchange their 100% membership interests in 350Green for $1,500,000 in CCGI restricted common shares at a price determined on a 20 trading day average.  RJN Exhibit C, Exhibit A, p. 2 of 22.  As of the proposed Closing Date of the Exchange Agreement of March 22, 2013, CCGI was trading at $1.33 per share and Defendants received 403,226 shares in total at the closing on April 22, 2013.  RJN Exhibit G.[17]  The Exchange Agreement made clear that the CCGI Shares were not registered, were issued to Defendants as under an exemption from Federal securities laws, and that each CCGI Share would bear a restrictive legend severely limiting Defendants' ability to resell.  RJN Exhibit C, Exhibit A, p. 12 of 22.

When the Exchange Agreement failed to close on the scheduled closing date of March 22, 2013, Defendants caused 350Green to enter into the JNS Deal, under which JNS Holdings agreed to acquire the "Chicago Assets" from 350Green, including hard assets consisting of 168 installed

---

[17]  As of March 31, 2015, CCGI was trading at 36 cents per share.  RJN Exhibit H.

charging stations, 51 chargers to be installed including and assorted inventory and spares, and assignment of 350Green's rights under its contract with the City of Chicago with the City's consent, in exchange for assumption of certain scheduled liabilities of 350Green related to the Chicago Assets and assumption of 350Green's performance obligations to the City of Chicago.   FAC ¶ 8; RJN Exhibit A.   The CCGI Parties' April Action sought to enjoin any transfer by 350Green to JNS Holdings, based on Plaintiffs' assertion that the Exchange Agreement remained in effect but had been breached.   FAC ¶¶ 32–35.   When the hearing date on the CCGI Parties' request for injunctive relief was set, the CCGI Parties, 350Green and Defendants settled, as among themselves but excluding JNS Holdings, with the settlement evidenced by the Addendum.   The Closing Date of the CCGI  Deal under the Exchange Agreement and Addendum occurred on April 22, 2013.   FAC ¶ 38. Although the CCGI Parties knowingly had not seen the asset purchase agreement between 350Green and JNS Holdings prior to the closing date for the CCGI Deal (the Addendum required only that 350Green deliver a copy as of the closing) (FAC ¶ 39), the CCGI Parties released all claims against 350Green and Defendants as provided in the Release.   FAC Exhibit B, ¶ 5, p. 3.   Further, the CCGI Parties gave the Release notwithstanding their oft-repeated allegations of  substantial bad conduct by Defendants and their "extensive due diligence" over the course of June 2012 through April 2013. FAC ¶¶ 14-20.

The only claims and causes of action that the CCGI Parties reserved concerning Defendants' alleged breach of the Exchange Agreement and 350Green's JNS Deal were claims and causes of against *JNS Holdings*, not against Defendants.   FAC Exhibit B, Section 6, p. 5 of 10 ("CCGI and CCGI Sub are reserving any and all rights, claims and defenses available to them in law and equity against JNS as it relates to any contracts or agreements related to the Chicago Project, including but not limited to, the right to seek to invalidate such agreements as a matter of law …..").   The CCGI

Parties elected to reserve their rights against JNS Holdings, but to let go of their claims against Defendants.

### H.    Facts Undisclosed by Plaintiffs in the December Complaint But Known by Plaintiffs.

A motion to dismiss under Rule 12(b)(6) is based upon the pleadings as presented to the Court.  However, when a party has knowledge of a fact but simply omits that fact from its pleading, the Court may go beyond the four corners of the complaint in ruling on a Rule 12(b)(6) motion.   The Second Circuit recently reaffirmed:

> [W]e have held that when a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure. . . . Similarly, when a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC, particularly where plaintiff has been put on notice by defendant's proffer of these public documents. . . .

*Cortec Indus.,* 949 F.2d at 47 (alteration in original). *See Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990).  *Cortec Industries* is consistent with the Second Circuit's previous construction of Rule 12(b)(6) in connection with facts and documents intentionally omitted by the pleader against whom a motion to dismiss is made.  For example, in *Cortec Industries* (internal citations omitted) the Court of Appeals upheld the District Court's dismissal of a complaint based on documents extrinsic to the complaint, reasoning that the trial and appellate courts could consider:

> any written instrument attached to [the complaint] as an exhibit *or any statements or documents incorporated in it by reference*, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and *documents that the plaintiffs either possessed or knew about* and upon which they relied in bringing the suit….

> Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.  (*Id.*, at 47–48 (emphasis added)).

Thus, Defendants' Motion to Dismiss must be considered in the context of the facts that Plaintiffs have withheld, as well as those that they have plead.

### 1.     CCGI's Public Filings Disclose Lack of Standing, Damages.

CCGI is subject to filing and disclosure rules as required by the Securities Exchange Commission.  The most recent 10Q filed by CCGI is for the quarter ending June 30, 2014.  RJN Exhibit D (the "**2014 Q2 10Q**").

The First Amended Complaint alleges that "[a]s a direct and proximate result of [Defendants'] misrepresentations, CCGI's growth from a small start up to a viable industry leader has been impaired, as these liabilities have harmed CCGI's credit rating, have hampered CCGI's ability to obtain government grants, and have impeded CCGI's ability to become listed on the NASDAQ Exchange."  FAC ¶¶ 82, 56.

The 2014 Q2 10Q discloses that the reasons for CCGI's failure to grow to a NASDAQ listed company lies beyond Defendants:  CCGI had "incurred an accumulated deficiency since inception of $56,882,207," it had a cash balance of $2,280,006 as of June 30, 2014, and it expected to suffer further losses after June 30, 2014.  RJN Exhibit D, 2014 Q2 10Q, p. 37.

As of the date of its most recent 10-Q, CCGI couldn't raise cash, was facing losses, and was given a going concern qualification by its auditors.  The 2014 Q2 10Q: "Although management believes that the Company has access to capital resources, there are currently no commitments in place for new financing at this time and there is no assurance that the Company will be able to obtain funds on commercially acceptable terms, if at all."  *Id.*, at 38.  The 2014 Q2 10Q concludes:  "These factors, among others, *raise substantial doubt about the Company's ability to continue as a going*

*concern*." *Id.* (emphasis added).

Ultimately, CCGI's 2014 8-K filed December 23, 2014 discloses that CCGI raised $6 million of phased financing by sale of new securities containing warrants which, if exercised would dilute the value of Defendants' existing common shares, the same common held by all other holders, to a value of $0.  RJN Exhibit F.

### (a)   CCGI Has Not Paid Defendants What They Are Owed.

The First Amended Complaint alleges that under the Addendum "Defendants were paid $500,000 in cash, and $750,000 worth of CCGI stock, while the original Exchange Agreement called for only an exchange of stock."  FAC ¶ 40.  However CCGI's public filings acknowledge the facts that the First Amended Complaint hides - Defendants have only been paid $140,000 of the $1,250,000 purchase price promised in the Exchange Agreement and Addendum.  Plaintiffs admit in public filings that CCGI "is currently in default" of its obligations to Defendants.  RJN Exhibit D, p. 22, § 11.  As to Plaintiffs' assertion that Defendants were "paid … $750,000 worth of CCGI stock" (FAC ¶ 40), public filings show a thin market for CCGI stock and a price that has dropped from $1.42 per share on the Addendum Closing Date to 36 cents.  Plaintiffs' assertion that "CCGI and 350 Holdings conferred a benefit on Defendants when they provided $750,000 worth of restricted CCGI shares and $500,000 in cash for Defendants' membership interests in 350 Green" (FAC ¶ 99) is demonstratively at odds with the publicly disclosed facts.

Indeed, Defendants have sued 350 Holdings and CCGI to recover the money they are owed. RJN Exhibit C.

### (b)   350Green's Rights Were Assigned to a Mortgage Trust in April 2014.

CCGI's public filings put in serious question whether any of the Plaintiffs have standing to assert claims on behalf of 350Green and whether 350 Green is properly before the Court as a plaintiff

in the First Amended Complaint.   CCGI's June 30, 2014 10Q discloses:

> On April 17, 2014, the Company's Board of Directors executed a resolution to form a Trust Mortgage related to 350Green.  A Trust Mortgage is a non-judicial vehicle for the reorganization and the debt restructuring or the sale or wind down of 350Green and a liquidation of its assets under the control of a third party trustee…The Trust Mortgage is a binding contract between 350 Green and the trustee, but not binding upon the creditors of 350 Green, to serve as fiduciary for the benefit of all creditors of 350 Green, whereby 350 Green confers upon the trustee the authority and power to manage the operations and assets of the business in a manner that will maximize recovery for 350 Green's creditors.  RJN Exhibit D, Q2 2014 10Q, p. 17.

No public record of the Trust Mortgage is identified in the Q2 2014 10Q, and the statement does not detail who the "trustee" is who would have standing in this action.[18]  As of February 18, 2015, when the First Amended Complaint was filed, it is difficult to imagine how 350Green could retain the causes of action allegedly asserted.

### (c)      350Green is Not Paying Creditors.

The First Amended Complaint alleges that "CCGI is now burdened with 350 Green's liabilities, which are above the amount that the Defendants represented in the Exchange Agreement and the First Addendum" under "Accounting Standards Codification Rule 1.8."  FAC ¶ 56.  Beyond the question of whether an accounting standard substantively exposes a parent corporation to the obligations of its subsidiaries as a matter of law, it is axiomatic that if neither 350Green nor the other Plaintiffs are paying their creditors, then Plaintiffs cannot have suffered damages as a result of

---

[18] CCGI's 10Q indicates that 350Green assets have been further sold, through the Mortgage Trust, to a CCGI affiliate:  "On May 29, 2014, EVSE Management LLC ("EVSE") a wholly owned subsidiary of the Company entered into a Management Services Agreement whereby EVSE would administer the contracts, including the servicing of the related charging stations, of 350Green on behalf of the Trustee in consideration of the revenues derived from such charging stations until the sale of the charging stations." *Id.*, at 18.  Within the same paragraph, the public documents state that "[o]n June 27, EVSE entered an Asset Purchase Agreement ("Agreement") with the Trustee of the Trust Mortgage and 350 Green to purchase from 350 Green" a list of assets.  *Id.*

350Green's continuing obligation to pay.[19]  Indeed, the public filings indicate that CCGI has written off its investment in 350Green and that the Trust Mortgage will bar future creditor claims against 350Green or any of its affiliates.

### III.   LEGAL STANDARD FOR MOTION TO DISMISS.

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of any complaint that fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Rule 12(b)(6) permits dismissal either where a plaintiff asserts no cognizable cause of action, or where insufficient facts are alleged to support a cause of action.  *S. Rd. Associates v. Int'l Bus. Machines Corp.*, 216 F.3d 251, 253 (2d Cir. 2000); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).  A "plaintiff's obligation to provide the 'grounds' of 'his entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted) (brackets in original).  Moreover, the Court is "not required to accept as true conclusory allegations" and does "not . . . necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations."  *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1139 (9th Cir. 2003) (citations and quotation marks omitted); *see also Iqbal*, 556 U.S. at 678.

---

[19]  The 2014 Q2 10Q confirms that none of 350Green, CCGI, nor CCGI Sub are paying 350Green obligations.  It states:  "There have been five lawsuits filed by creditors of 350 Green regarding unpaid claims…. Also, there are other unpaid creditors, aside from those noted above, that claim to be owed certain amounts for pre-acquisition work done on behalf of 350Green, and only 350Green, that potentially could file lawsuits at some time in the future."  RJN Exhibit D, p. 42.  The failure, or refusal, of 350Green to pay its debts also drove CCGI's decision to cause 350Green to make the Trust Mortgage described above.

Although Defendants are entitled to raise the Release as an affirmative defense to Plaintiffs' First Amended Complaint under Federal Rule 8(c), they need not put the case at issue in order to obtain the benefit of the settlement they negotiated with Plaintiffs in resolution of the April Action.   There is ample authority to support the Court's adjudication of affirmative defenses on a motion to dismiss under Rule 12(b)(6) where the facts necessary to establish the defense are evident on the complaint's face. *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (adjudicating the affirmative defense of fair use to resolve a motion to dismiss a trademark dispute); *see also Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137 (2d Cir. 2010) (upholding dismissal of securities fraud action on basis of affirmative defense of absence of loss causation); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) (surveying opinions adjudicating various affirmative defenses to resolve motions to dismiss). This general principle of resolving Rule 8 affirmative defenses by way of Rule 12(b)(6) motion has been applied specifically in cases where the applicable defense was that plaintiff had signed a release that extinguished the claims and causes of action it later tried to assert. *See, e.g., Patrowicz v. Transamerica HomeFirst, Inc*., 359 F. Supp. 2d 140, 144 (D. Conn. 2005) ("The defense of res judicata or release may be raised on a Rule 12(b)(6) motion to dismiss if all relevant facts are shown by the court's own records." ) (internal quotation and citation omitted).

In this case, Defendants gave substantial consideration in exchange for the Release obtained in April of 2013.  They surrendered 100% of their membership interests in 350Green on April 22 and thereafter had no input or role in subsequent decisions about operations, financing or otherwise of the company they founded.  The Release should be enforced to bar Plaintiffs' claims alleged in Counts I through V, and VII.

## IV.   <u>CONCLUSION.</u>

Timothy Mason and Mariana Gerzanych respectfully request that the Court dismiss those claims asserted by Plaintiffs that were released on April 22, 2013.  Plaintiffs' earlier April Complaint alleged breach of the same Exchange Agreement that is at issue before the Court today.  CCGI's public records show that Mr. Mason and Ms. Gerzanych *will not* receive the benefit of the bargain on

the cash and stock they struck in the Exchange Agreement.  Their bargained-for release should be enforced against CCGI.  Defendants suggest that there is solid foundation for the Court's dismissal of all causes of action in the First Amended Complaint other than Count VI.


Respectfully submitted,

Dated:  New York, New York
        April 3, 2015

__/s/ Cary Samowitz_____

**DLA PIPER LLP (US)**
Cary Samowitz
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500
cary.samowitz@dlapiper.com

Frank T. Pepler
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
(415) 836-2500
frank.pepler@dlapiper.com
*Admitted Pro Hac*

*Attorneys for Defendants*