**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
Case No.: 13-cv-08755-KPF

CAR CHARGING GROUP, INC.,
a Nevada corporation,
350 HOLDINGS, LLC, a Florida limited liability
company, CAR CHARGING, INC, a Delaware
corporation, and 350 GREEN, LLC, a Virginia
limited liability company

v.                                    Plaintiffs,

MARIANA GERZANYCH and
TIMOTHY MASON,
                         Defendants.

_____/


<u>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT**</u>
<u>**TO FED. R. CIV. P. 12(b)(6)**</u>

THE BERNSTEIN LAW FIRM
1688 Meridian Avenue, Suite 418
Miami Beach, Florida 33139
Telephone: (305) 672-9544
Facsimile: (305) 672-4572
*Counsel for Plaintiff*

# TABLE OF CONTENTS

Table of Contents……………………………………………………..........................i

Table of Citations ……………………………………………….........................iii

I.    Introduction...…………………………….……………………………………1

II.   Background …………………………………………………………………..2

    A.  The Sale of 350 Green to 350 Holdings……………………………………...2

    B.  Failure of the Transaction to Close …………………………………………4

    C.  Releases Regarding JNS Holdings Corporation/NY Litigation …………………..5

    D.  The Chicago Litigation ……………………………………………………...6

    E.  Defendants' Bankruptcy Filings ...........................................................................7

III.   Argument …………………………………………………………………..9

    A.  Legal Standard …………………………………………………………………9

    B.  The Existence of the Release is not Dispositive ………………………………9

        a.   Fraudulent Inducement
            is not Barred by the Agreement ………………………………………9

        b.  Defendants' Fraudulent Inducement Voids Release…………………11

        c.   The Amended Complaint
            Should not be Dismissed as a Matter of Law....................................15

            a. The Legal Standard……………………………………………15

            b. Defendants can be liable for Torts……………………………15

            c. Defendants' Timeline is Incorrect and Irrelevant …………….17

            d. 350 Green's Outstanding Liabilities/Efacec…………………..20

            e. 350 Green has Standing to Pursue Claims …………………..22

f. CCGI has not Paid Defendants …………………………………..23

g. 350 Green and the Trust Mortgage…………………………24

h. 350 Green's Creditors...........…………………………………24

IV.    Conclusion ………………………………………………………………..25

<u>**TABLE OF CITATIONS**</u>

**CASES**

<u>Bank of Am., N.A. v. GREC Homes IX, LLC</u>
2014 U.S. Dist. LEXIS 8316 (S.D. Fla. 2014) ……………………………………………10

<u>Caballero v. Phoenix Am. Holdings, Inc.</u>
79 So. 3d 106 (Fla. 3d DCA 2012) …………………………………………………...13

<u>Cerniglia v. Cerniglia</u>
679 So. 2d 1160 (Fla. 1996) …………………………………………………………13

<u>Chapman v. New York State Div. for Youth</u>
546 F.3d 230 (2d Cir. 2008) …………………………………………………………18

<u>Chiaramonte v. Animal Med. Ctr.</u>
2014 U.S. Dist. LEXIS 99930, *4 (S.D.N.Y, 2014)..……………...............................9,22

<u>Cortec Industries, Inc. v. Sum Holding L.P.</u>
 949 F.2d 42 (2nd Cir. 1991) …………………………………………………………21

<u>Eclipse Med., Inc. v. American Hydro-Surgical Instruments, Inc.</u>
262 F. Supp. 2d 1334 (S.D. Fla. 1999) ……………….....................................................10

<u>First Fin. USA, Inc. v. Steinger</u>
760 So. 2d 996 (Fla. 4th DCA 2000)…………………………………………………16

<u>Gorfinkel v. Vayntrub</u>
2014 U.S. Dist. LEXIS 116313 (EDNY, 2014) …………………………………………17

<u>Hardage Enters. v. Fidesys Corp.</u>
570 So. 2d 436 (Fla. 5th DCA 1990) ………………………………………………...12,13

<u>IHS Acquisition XV v. Kings Harbor Care Ctr.</u>
1999 U.S. Dist. LEXIS 5448, *4 (SDNY, 1999) …………………………………………15

<u>Kobatake v. E.I. Dupont De Nemours & Co.</u>
162 F. 3d 619 (11th Cir. 1998) ………………………………………………………11

<u>Mazzoni Farms v. E. I. Dupont De Nemours & Co.</u>
761 So. 2d 306 (Fla. 2000)……………………………………………………………11

<u>Pani v. Empire Blue Cross Blue Shield</u>
152 F.3d 67 (2nd Cir. 1998) ………………………………………….......................15,17

Peebles v. Sheridan Healthcare, Inc.
853 So. 2d 559 (Fla. 4th DCA 2003)………………………………………………………..13

Perfumania Holding Corp. v. XL/Datacomp, Inc.
605 So. 2d 976 (Fla. 3d DCA 1990) …………………………………………………………13

Roth v. Jennings
489 F.3d 499 (2d Cir. 2007)……………………………………………………………...18

## I.    Introduction

On February 18, 2015, 350 Green, LLC ("350 Green"), 350 Holdings, LLC ("350 Holdings"), in conjunction with the Order of this Court dated February 5, 2015 [D.E. #8], Car Charging Group, Inc. ("CCGI") and Car Charging, Inc. ("Car Charging") (collectively the "Plaintiffs" or the "CCGI Entities") filed their Amended Complaint [D.E. # 9] (the "Amended Complaint") against Defendants Tim Mason ("Mason") and Mariana Gerzanych ("Gerzanych") (Mason and Gerzanych are collectively referred to as "Defendants") alleging counts of (i) Breach of Contract; (ii) Fraud in the Inducement; (iii) Civil Conspiracy to Commit Fraud; (iv) Unjust Enrichment; (iv) Declaratory Judgment; (vi) Breach of Contract (against Defendant Mason) of a Right of First Refusal Agreement; and (vii) Breach of Fiduciary Duty (by 350 Green against Defendants).

Thereafter, on April 3, 2015, Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) [D.E. #21] (the "MTD") requesting that this Court dismiss Counts I-V and VII of the Amended Complaint. The crux of the argument made by Defendants in their MTD rests largely on the language of the Amendment to the Equity Exchange Agreement executed on April 22, 2013 (the "Amendment") wherein CCGI and 350 Holdings agreed to release Defendants from potential litigation arising from the underlying transaction wherein 350 Holdings purchased Defendants' interests in 350 Green (the "Release").[1] Notably and quite telling, Defendants are not seeking a dismissal based on Plaintiffs' purported failure to state a cause of action. As discussed more fully herein, it is Plaintiffs' position that the Release at issue is void as a matter of law because it was procured by the fraudulent misrepresentations of the Defendants. Moreover, and at best, the issue of whether the Release is void and voidable is a factual issue

---

[1] Count IV of the Amended Complaint is solely against Mason and is based on an independent Right of First Refusal Agreement executed between Car Charging and Mason and Gerzanych on April 22, 2013 (the "ROFR").

which should preclude this Court granting Defendants the relief sought in the MTD as a matter of law. Consequently, this Court should deny Defendant's MTD in its entirety, and Plaintiffs should be permitted to proceed with the prosecution of the instant action.

## II. Background

### A. *The Sale of 350 Green to 350 Holdings*

CCGI is a service provider for electric vehicle ("EV") charging stations across the United States. CCGI, 350 Holdings and 350 Green, by and through the Defendants who were principals of 350 Green at the time, began negotiation for 350 Holding's purchase of all the membership interests of 350 Green from Defendants on or about July 5, 2012, via the execution of a binding term sheet agreement (the "July Term Sheet"). The provisions of the July Term Sheet allowed for CCGI and 350 Holdings to conduct due diligence on 350 Green to determine if it wished to proceed forward with the negotiation and execution of a final binding agreement for 350 Holdings to purchase the membership interests of 350 Green (the "Transaction").

During the course of the parties' negotiations, CCGI and 350 Holdings became aware that the Defendants faced potential federal investigations into criminal activities, and had further failed to fulfill almost all of their contractual obligations with vendors and/or clients. In fact, on July 20, 2012, the FBI executed a search warrant on the Defendants' offices. CCGI and 350 Holdings were able to ascertain that the Defendants had allegedly and repeatedly engaged in numerous criminal activities regarding the treatment of grant and funding reimbursements from state agencies across the country. One of the grant and funding reimbursements for which alleged criminal activities occurred prior to entering into negotiations for the Transaction, was a grant awarded to 350 Green in the amount of $1,911,000 by the City of Chicago to install a network of EV charging stations in the Chicago area (the "Chicago Project"). 350 Green and the

City of Chicago had executed a contract on October 18, 2010, which called for the Chicago Project to be completed on or about December 31, 2013.

In light of the aforesaid criminal allegations against Defendants and CCGI's due diligence, CCGI requested that 350 Green enter into a new binding Term Sheet which was executed on August 29, 2012 (the "August Term Sheet") and which contained, amongst other provisions, extended the due diligence period and time for the negotiation and execution of a final binding agreement.

Despite the execution of the August Term Sheet and its accompanying extended due diligence period, the Defendants stonewalled CCGI and 350 Holdings' ability to complete their due diligence investigation of 350 Green, primarily by refusing to supply CCGI and 350 Holdings with vital documentation, despite repeated requests from CCGI's accountants. Despite the foregoing intentional bad faith acts by Defendants, the parties continued to negotiate based in part on pertinent financial documents provided by Defendants during the extended due diligence period. Based directly and proximately on the financial documentation provided by the Defendants, the final analysis by CCGI and 350 Holdings determined that the acquisition of 350 Green would be a favorable strategic move for CCGI's overall business plan and would positively impact the fundamentals of CCGI's business.

Consequently, on March 8, 2013, CCGI, 350 Holdings, 350 Green and the Defendants executed the Exchange Agreement which was a final binding agreement to purchase Defendants' membership interests in 350 Green (hereinafter, the "Exchange Agreement"). The Exchange Agreement, among other things, called for the transfer of the membership interests of 350 Green in exchange for 1,111,111 shares of CCGI common stock to be paid to the Defendants.

Further, the terms of the Exchange Agreement required that both the applicable assets and liabilities of 350 Green remained with the company, post-closing. In particular, the values of both the assets and liabilities related to the Chicago Project were a material component in determination of the price that was ultimately paid for the purchase of Defendants' membership interests in 350 Green. In fact, both prior to the execution of the Exchange Agreement and within the Exchange Agreement itself, Defendants *expressly represented* that the amount of outstanding vendor liabilities related to the Chicago Project was $1,582,337.44.

B. *Failure of the Transaction to Close*

Subsequent to the March 21, 2013 closing date under the Exchange Agreement, Defendants and 350 Green refused to close the Transaction based on a unilateral claimed "termination" which it was later learned, was due to the fact that Defendants, in direct violation of the Term Sheets, had been in contact with representatives from JNS Holdings Corp. ("JNS Holdings") in an effort to sell the assets related to the Chicago Project.

As a result of the Defendants' refusal to close the Transaction, on April 9, 2013, CCGI and 350 Holdings filed suit against 350 Green, the 350 Members, and JNS Holdings in the United States District Court for the Southern District of New York in the case entitled *Car Charging Group, Inc., et al. v. 350 Green, LLC and JNS Holdings Corporation*, under Case No.: 13-cv-2389 (the "350 Action"). CCGI and 350 Holdings filed an eight (8) count complaint in the 350 Action seeking, among other things specific performance by the Defendants under the terms of the Exchange Agreement.

On April 17, 2013, during the pendency of the 350 Action, it was discovered that 350 Green and JNS Power & Holdings Systems, Inc. ("JNS Power"), a subsidiary of JNS Holdings, entered into an Asset Purchase Agreement (the "APA") wherein JNS Power agreed to purchase

the one hundred sixty-eight (168) installed electric car chargers and fifty-one (51) uninstalled chargers that were to be installed for the Chicago Project. It was further learned that the closing of the APA was set to take place on April 29, 2013.

Ultimately, the 350 Action was resolved through extensive settlement negotiations, which culminated on April 22, 2013, with CCGI, 350 Holdings, 350 Green and Defendants closing the Transaction as contemplated under the Exchange Agreement, with additional terms and conditions memorialized in the First Addendum to the Exchange Agreement (the "First Addendum") (a copy attached to the Amended Complaint D.E.#19-2) which specifically included the Chicago Assets, as well as the liabilities associated therewith. The First Addendum also provided Defendants with additional consideration in the form of both a payment of $500,000 in cash, and $750,000 worth of CCGI stock, while the original Exchange Agreement called for only an exchange of stock. In addition, Section 5 of the First Addendum contained the Release language which states, in pertinent part:

C. Releases Regarding JNS Holdings Corporation/NY Litigation.

****

(a)    For and in consideration of both: (i) the reservation of rights set forth in Section Six (6) hereof; and (ii) the transfer of the 350 Interests pursuant to the terms herein, CCGI does hereby release with prejudice and forever discharge 350 and the 350 Members, their agents, employees, successors and assigns, and their respective heirs, personal representatives, affiliates, successors and assigns, from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature whatsoever which CCGI may now have or may hereafter have, arising out of or in any way relating to any and all injuries and damages of any and every kind that may develop in the future, as a result of or in any way relating to**:  (x) the NY Litigation against 350 and the 350 Members; (y) the 350 and 350 Members' discussions with JNS, or any contract for the sale of the Chicago Assets to JNS.**

*****

(d)    The Parties expressly agree that the foregoing mutual releases, dismissals and the indemnification of each identified "350 Indemnified Party", as set forth in subsections (a)-(c) above, respectively, are limited to: (i) **the NY Litigation against 350 and the 350**

**Members; and (ii) the 350 and 350 Members' discussions with JNS, or any contract for the sale of the Chicago Assets to JNS.**

Moreover, in conjunction with the settlement of the 350 Action and the execution of the First Addendum: (i) Car Charging and Defendants executed the ROFR, wherein Car Charging was given the first exclusive right to exercise an exclusive first right of refusal with respect to any and all EV industry related business opportunities presented or afforded to Defendants; and (ii) on April 24, 2013, 350 Holdings executed a promissory note wherein only 350 Holdings guaranteed payment of the sum of $490,000.00 to Defendants (the "Promissory Note"). As part of the terms of the Promissory Note, Defendants were granted a lien on and security interest in $490,000.00 worth of 350 Holdings' assets identified therein, upon which Defendants filed UCC-1 statements to evidence said indebtedness. On May 7, 2013, CCGI delivered the CCGI Shares pursuant to the terms of the First Addendum.

    D. *The Chicago Litigation*

Subsequent to the execution of the First Addendum, a dispute arose between CCGI, 350 Holdings and JNS as to which party was the rightful owner of the Chicago Assets. Consequently, CCGI and 350 Holdings filed a Complaint against JNS Power and JNS Holdings (collectively "JNS") in the United States District Court, Northern District of Illinois, in a case entitled *Car Charging Group, Inc., et al. v. JNS Holdings Corporation, et al*., case number 13-CV-03124 (the "CCGI Action"). On May 5, 2013, JNS Power filed a separate action against 350 Green seeking (i) specific performance under the APA and (ii) damages based on breach of contract/indemnification in a case entitled JNS Power & Control Systems, Inc. v. 350 Green, LLC, case number 13-cv-04020 (the "JNS Action"). The district court consolidated the CCGI Action and the JNS Action, thought the CCGI Action was subsequently dismissed due to a lack of subject matter jurisdiction.

On August 5, 2013, CCGI, 350 Holdings, and 350 Green moved for Partial Summary Judgment, seeking a declaration that the APA is void as a matter of law. Concurrently, on August 5, 2013, JNS Power filed a Motion for Partial Summary Judgment, seeking specific performance under the terms of the APA. On September 24, 2013, the Honorable Elaine Bucklo granted JNS Power's Motion for Partial Summary Judgment, and denied CCGI, 350 Holdings, and 350 Green's Motion for Partial Summary Judgment, and 350 Green was ordered to comply with the terms of the APA and directed to transfer the assets to JNS Power. 350 Green appealed the Order to the Seventh Circuit Court of Appeals, and while the case was argued before the Seventh Circuit in December, 2014, no decision by the Seventh Circuit has been rendered.

During the pendency of the Chicago litigation, it was discovered that pursuant to the terms of the APA, JNS Power is only responsible for the assumption of liabilities connected in to the Chicago Project in the amount of $1,617,040.73. Any liabilities over the amount of $1,617,040.73 that are connected to the Chicago Project remain the liability of 350 Green. The liabilities that Defendants represented in the APA are $243,245.61 more than Defendants represented was the amount of liabilities in the Exchange Agreement.

After the parties executed the First Addendum and CCGI continued its investigation into 350 Green's financials, it was discovered that Defendants intentionally misrepresented certain financial information, and the actual amount of liabilities owed by 350 Green in connection with the Chicago Project was actually $3,475,486.18, which is approximately an additional $1,858,445.45 more in liabilities than Defendants represented to CCGI that 350 Green owed to various contractors in connection with the Chicago Project.

E.      *Defendants' Bankruptcy Filings*

On January 21, 2014, Gerzanych filed Chapter 11 in the Bankruptcy in the United States Bankruptcy Court for the Central District of California, case number 8:14-bk-10391-ES (the "Gerzanych Bankruptcy Action"). That same day, Mason also filed Chapter 11 Bankruptcy on January 21, 2014 in the Bankruptcy in the United States Bankruptcy Court for the Central District of California, case number 8:14-bk-10395-MW (the "Mason Bankruptcy Action"). On April 28, 2014, the Car Charging Entities filed an Adversary Complaint for Denial of Discharge Under 11 USC §523(a)(2), (4), and (6) against Gerzanych [Case No. 8:14-ap-01133-ES, D.E. # 1] and Mason [Case No. 8:14-ap-01132-ES, D.E. # 1] (collectively, the "Non-Dischargeability Complaints"). The relief sought in the Non-Dischargeability Complaints was based, in part, on Defendants fraudulent misrepresentations and willful and purposeful concealment of the full amount of 350 Green's liabilities to CCGI and 350 Holdings prior to the execution of the Exchange Agreement and First Addendum.

On April 24, 2014, Defendants filed a Complaint against the Plaintiffs in the United States Bankruptcy Court, *In re Gerzanych*, [Lead Case No. 8:14-bk-10391-ES, (administered jointly with *In re: Mason*, 8:14-bk-10395-ES, D.E. #1] (the "Gerzanych Action"), alleging the following causes of action against Plaintiffs based on Plaintiffs' alleged breach of certain documents related to the Exchange Agreement and First Addendum. Plaintiffs subsequently moved to transfer venue of the Gerzanych Action to the United States District Court for the Southern District of New York, or, in the alternative, dismiss counts (v) fraud in the inducement and (vi) unjust enrichment and restitution. On December 9, 2014, Judge Eritha A. Smith in the Gerzanych Action entered an order which lifted the stay [case no. 8:14-bk-10391-ES D.E. #62], and transferred to this Court.

On March 3, 2015, the Defendants were indicted by a federal grand jury in the Northern District of Illinois. Defendants disclose this fact in the MTD [D.E. 22, p. 14, note 3], and disingenuously note, "Certain of the allegations contained in the indictments may relate to Defendants' operation of 350 Green and the Chicago Project." However, pursuant to the Debtor's motion to employ special criminal counsel filed in the Bankruptcy Actions, the indictment alleges that "*350 Green falsely represented that certain expenses were incurred or paid by 350 Green with respect to grant agreements with the City of Chicago and other local governments in Pennsylvania and California.*" See, Exhibit A, p. 3. The foregoing allegations of false representations are very much interconnected with the fraudulent representation made by Defendants to Plaintiffs under the Exchange Agreement.

### III. Argument

#### A. Legal Standard

It is well settled that the standard for considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Chiaramonte v. Animal Med. Ctr.*, 2014 U.S. Dist. LEXIS 99930, *4 (SDNY, 2014). As demonstrated herein, it is Plaintiffs' position that Defendants' argument, that the Release at issue is void as a matter of law because it was procured by the fraudulent misrepresentations of the Defendants. As a result, this Court should deny Defendant's Motion in its entirety.

#### B. The Existence of the Release is not Dispositive

##### a. Fraudulent Inducement is not Barred by the Agreement

Interestingly and quite tellingly, Defendants are not arguing that the Amended Complaint (other than Count VI against Mason) should be dismissed for failure to property state a cause of action. Defendants' instead argue that under applicable Florida law, Plaintiffs are barred from making their claims due to the existence of the Release. However, notwithstanding the fact that Defendants argument is inapplicable to the pending action due to the limited scope of the release, to the extent the argument would be applicable, under well settled Florida law, a contract entered as a result of fraudulent inducement results in a voidable contract. *Bank of Am., N.A. v. GREC Homes IX, LLC*, 2014 U.S. Dist. LEXIS 8316 (S.D. Fla. 2014).

Defendants' initial argument, that a claim for fraudulent inducement due to the existence of a written contract, and their reliance upon *Eclipse Med., Inc. v. American Hydro-Surgical Instruments*, Inc., 262 F. Supp. 2d 1334 (S.D. Fla. 1999) in support of their position are wholly misplaced and without merit. In *Eclipse*, the court granted the defendant's motion for summary judgment because the alleged oral promise made by the defendant contradicted the express terms of the applicable written agreement. The situation at bar is wholly distinguishable, as there was no oral promise by the Defendants that they would perform outside of the terms of the Agreement. It was the false representations related to the outstanding liabilities that were affirmatively made by Defendants within the Exchange Agreement upon which CCGI and 350 Holdings detrimentally relied upon when performing their financial evaluation of 30 Green and deciding to complete the Transaction and purchase Defendants' membership interests in 350 Green and against when they determined that they would pay Defendants additional funds pursuant to the terms of the First Addendum. The fraud claimed by Plaintiffs is not contradicted by the terms of the Agreement, as the court found was the case in *Eclipse* but, in fact, supported by the false representations made therein by Defendants.

b. _Defendants' Fraudulent Inducement Voids Release_

Defendants next take the erroneous position that Florida law would uphold the release language set forth in Section 5 of the Amendment. Plaintiffs submit that the limited language of the release incorporated in the First Amendment completely undermines Defendants arguments and the cases they rely upon.  In addition, based on the very case law cited by Defendants in support of their MTD (in particular _Mazzoni Farms v. E. I. Dupont De Nemours & Co_., 761 So. 2d 306 (Fla. 2000) which is inapplicable to the instant matter), assuming this Court finds insufficient grounds to deny their MTD outright, the issue of the applicability of the Release is a factual issue that is not the proper subject matter of a 12(b)(6) Motion.

The Release is not a general, all encompassing release that acted to release Defendants from any and all liability whatsoever, but is only limited to a release specifically related to the New York Action and the sale of the Chicago Assets to JNS.  The Release does not by its own unambiguous language release the Defendants from affirmative statements made to CCGI and/or 350 Holdings as it relates to the representations made in the Exchange Agreement or Addendum. Defendants rely upon _Mazzoni Farms_ for the proposition that the release language prohibits any additional fraud claims against Defendants.  Defendants, however, have misinterpreted the Florida Supreme Court's holding in _Mazzoni Farms,_ as the _Mazzoni Farms_ Court did not ultimately bar potential fraudulent misrepresentation claims.  _Mazzoni Farms_ is a much more nuanced case than Defendant would have this Court believe.[2]  In particular, the Court held, in pertinent part:

> Although the language in the _Quarterman_ case releasing "any and all other persons" was more general than the releases at issue, the court was still reluctant to construe the release broadly. **Certainly, the restrictive**

---

[2] Further, _Kobatake v. E.I. Dupont De Nemours & Co_., 162 F. 3d 619 (11th Cir. 1998), also cited by Defendants, is wholly inapplicable, as it was decided under Georgia law.

***Quarterman* approach is warranted here where the releases are significantly narrower in scope.** Further, while the court in *Dresden* enforced a release for "any and all" causes of action that could have arisen out of the original claim or in any matter related to the releasing party, that release was far more general than the Morningstar, PBG and Country Joe agreements. The limitation in the nurseries' releases distinguishes *Dresden* from the instant case. Likewise, the release in *Hardage* discharged the party from liability "for or because of any matter or thing done, omitted, or suffered to be done . . . and in any way directly or indirectly arising out of the . . . agreement . . . and all of the transactions and occurrences above-described." *Hardage*, 570 So. 2d 436, 437 (Fla. 5th DCA 1990). Unlike the Morningstar, PBG, and Country Joe releases, the Hardage release barred claims that arose directly or indirectly out of the agreement. This "indirect" aspect of the Hardage release demonstrates the breadth that is lacking in the nurseries' releases. **In short, the provision in the Morningstar, PBG, and Country Joe releases that limits the released claims to those accruing "by reason of the use or application of [Benlate]" is not sufficiently broad to bar the present fraudulent inducement claims.**

Similarly, in the instant matter the Release language is sufficiently narrow that it does not sufficiently broad to bar the present fraud claims against Defendants. Moreover, the basis of Plaintiffs' Amended Complaint is that Plaintiffs were not, and could not have been on notice of the truth of the outstanding liabilities because Defendants represented that the amount of outstanding vendor liabilities related to the Chicago Project was $1,582,337.44. The Amended Complaint is clear that even after the execution of the Exchange Agreement and First Addendum, in November, 2013, Defendants continued to provide inaccurate financial information to CCGI (D.E. # 9, ¶69-74). This is not a situation where an experienced business was granted full access to pertinent records by the Defendants and chose not to protect itself, but where the Defendants both stymied CCGI and 350 Green's attempts to obtain information relevant to the purchase of Defendants' membership interests in 350 Green and provided false information as to the purported amount of 350 Green's outstanding liabilities.

Next, Defendants argue that the Release should serve to dismiss Plaintiffs' claims because Florida law tends to construe releases broadly. However, all the cases cited by

Defendants are both distinguishable from the case at bar, and notably, were decided on either motion for summary judgment or at trial. **None of them** were decided on a Motion to Dismiss. For example:

a. In *Caballero v. Phoenix Am. Holdings, Inc*., 79 So. 3d 106 (Fla. 3d DCA 2012), the appellate court dismissed certain claims of an ex-employee's complaint because he previously released the defendants from actions related to his employment with defendant, termination and pay, but left other claims related to post-release actions by the defendant.

b. In *Peebles v. Sheridan Healthcare, Inc*. 853 So. 2d 559 (Fla. 4th DCA, 2003), the appellate court dismissed a fraud claim because the allegations of certain oral misrepresentations by defendants were inconsistent with the clear terms of the agreement at issue.

c. *Cerniglia v. Cerniglia*, 679 So. 2d 1160 (Fla. 1996) involved the court's interpretation of clear and unambiguous language of the general release. There, the fraud claim was based on nondisclosure of financial assets; however, the Florida Supreme Court held that the pursuant to the broad release language, the parties relinquished "all claims of whatever nature . . . to any assets/property . . . of whatever kind."

d. *Perfumania Holding Corp. v. XL/Datacomp, Inc*., 605 So. 2d 976 (Fla. 3d DCA 1990) and *Hardage Enters. v. Fidesys Corp*., 570 So. 2d 436 (Fla. 5th DCA 1990) both deal with the *interpretation* of the language of a release.

As it relates to the language of the First Addendum, the Release is <u>not</u> a general but limited release which language purposely and specifically defines which the matters which the Parties are releasing themselves and does not preclude Plaintiffs' fraud claims as set forth in the Amended Complaint.

The New York Action previously filed by CCGI and 350 Holdings against 350 Green and the Defendants consisted of an eight (8) count complaint seeking: (i) damages based on counts of breach of the Exchange Agreement for refusing to close thereunder; (ii) damages based on the breach of the August Term Sheet by negotiating and entering into a formal letter of intent with JNS Power; (ii) damages based on breach of the implied covenant of good faith and fair dealing;

(ii) specific performance by 350 Green and the Defendants under the terms of the Exchange Agreement; (iii) a permanent injunction against 350 Green and the Defendants from selling any assets to JNS Power; and (iv) damages against JNS Power based on its tortious interference with the CCGI and 350 Holdings' contractual relations with 350 Green and the Defendants. The allegations in the New York Action did not involve Defendants' affirmative representations to CCGI and 350 Holdings related to the outstanding liabilities of 350 Green.

Despite Defendants' unfounded and self-serving accusations, Plaintiffs have not, nor have they ever, waived any of their post-closing rights under the Exchange Agreement or any addendums thereto. Plaintiffs' claims against Defendants relate to the purposeful misrepresentations of critical financial information made by Defendants for the purpose of increasing the value of their membership interests in 350 Green.

Furthermore, the financial records at issue containing the fraudulent amounts were provided to CCGI and 350 Holdings by Defendants in response to requests for financial information during Plaintiffs due diligence under the Exchange Agreement, so it is completely disingenuous for the Defendants to alleged that Plaintiffs "had unlimited access to 350 Green's books and records" (MTD, p. 7). In Section 2.12 of the Exchange Agreement, Defendants represent that they have no knowledge of any liabilities other than those disclosed on Schedule 2.12(a) of the Exchange Agreement, which is undeniably false. Pursuant to the allegations in the Amended Complaint, not only did CCGI continue to attempt to audit 350 Green's records, Defendants continued to intentionally provide CCGI inaccurate financial information as late as eight months after closing (Amended Complaint ¶72), and approximately one month prior to the filing of the instant action. Notwithstanding the forgoing, the accusation by Defendants that Plaintiffs did not exercise certain rights under the Exchange Agreement or the First Amendment

thereto (accusations which are emphatically disputed by Plaintiffs), are issues of fact that are not properly determined on a motion to dismiss.

Based on the foregoing, it is evident that under Florida law Plaintiffs are able to proceed with the prosecution of their fraud claims despite the existence of the Release because (i) Plaintiffs' claims of fraud were independent of the Exchange Agreement and First Addendum; (ii) the Release does not release Defendants from Plaintiffs' fraud claims; and (iii) assuming, *arguendo*, the Release included the claims made in the Amended Complaint (which it does not), because it was procured by fraud it would be an issue of fact as to whether the Release would be enforceable or voidable against Plaintiffs.   As a result, Defendants' Motion to Dismiss should be denied in its entirety as a matter of law.

**C.   The Amended Complaint Should not be Dismissed as a Matter of Law**

  *a.   Legal Standard*

An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without the need to resort to summary judgment procedure, if the defense appears on the face of the complaint. *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2nd Cir. 1998).   As demonstrated herein, Defendants fail to demonstrate that their affirmative defenses are clearly established by the allegations within the Amended Complaint that would warrant such a dismissal.   Moreover, even if this Court determines that the Amended Complaint may allege facts that constitute a defense to some of Plaintiffs' claims, which Plaintiffs vehemently deny is the case, the fact that a complaint may allege facts that constitute a defense to the claims does not require dismissal of the complaint prior to discovery.  *IHS Acquisition XV v. Kings Harbor Care Ctr.*, 1999 U.S. Dist. LEXIS 5448, *4 (SDNY, 1999).

  *b.   Defendants can be liable for Torts*

Defendants' MTD argues that the Amended Complaint and "related documents" demonstrate that the Amended Complaint (less Count VI against Mason) should be dismissed. Defendants first argue that it was not the Defendants who made any representations under the Agreements, but said (mis)representations were made by 350 Green. It is well settled that under Florida law, officers and agents of a company "may be held personally liable for their tortious acts, even if such acts were committed within the scope of their employment or as corporate officers. Specifically, a corporate officer or representative of a defendant corporation is not shielded from individual liability for his own torts. Fraud in the inducement is a recognized intentional tort that can subject a corporate officer to individual liability." *First Fin. USA, Inc. v. Steinger*, 760 So. 2d 996 (Fla. 4th DCA 2000).

Second, there is no dispute that at the time the parties executed the Exchange Agreement and First Addendum, Defendants owned 100% of the membership interests of 350 Green. Plaintiffs have alleged that the Defendants' purposeful failure to disclose all known liabilities connected with the Chicago Assets made by Defendants was done purposely to induce CCGI and 350 Holdings into paying an inflated price for Defendants' interests in 350 Green (Amended Complaint ¶70-72, 76-80). Gerzanych executed the Exchange Agreement and First Addendum in her capacity as a member and Chief Executive Officer of 350 Green. Mason executed the Exchange Agreement and First Addendum in his capacity as a member of 350 Green. Defendants' argument that the Defendants, in their individual capacity did not make any actionable representations to Plaintiffs is completely ludicrous, and the notation that they could not ultimately be liable for the torts of conspiracy to commit fraud and fraudulent inducement, is not supported by any applicable case law.

Defendants' further contend that the representations made in the Exchange Agreement were (allegedly) never meant to be complete, but were qualified by Defendants' knowledge at the time the documents were executed, relying upon Section 2.9.1 of the Exchange Agreement acknowledges that 350 Green's financial statements were not prepared in accordance with the "generally accepted accounting principles applicable in the United States of America ("U.S. GAAP")". The Exchange Agreement, however, does not give the Defendants an opportunity to stonewall and misrepresent pertinent financial information to Plaintiffs. The crux of Plaintiff's claims are simple, and can be boiled down as follows: "Defendants, knowing that Plaintiffs would be required to satisfy any outstanding liabilities that were incurred for work connected to the Chicago Project if they purchased 350 Green's membership interests, conspired to provide Plaintiffs with fraudulent information relating to 350 Green's existing liabilities, including those that were incurred in connection with the Chicago Project to make it appear that 350 Green's membership interests were worth more than they were had Defendants provided Plaintiffs with the actual amount of liabilities." (Amended Complaint ¶88). Defendants' affirmative act of purposely providing the misleading information to CCGI and 350 Holdings for the purpose of getting a higher payout forms the basis of the underlying torts alleged by Plaintiffs (Amended Complaint, ¶89-91).

c. _Defendants' Timeline is Incorrect and Irrelevant_

It is well settled that on a motion to dismiss, the Court is constrained to addressing the "four corners" of the complaint. See, _Gorfinkel v. Vayntrub_, 2014 U.S. Dist. LEXIS 116313 "but in certain instances the Court may consider outside documents. _Pani v. Empire Blue Cross Blue Shield_, 152 F.3d 67, 71 (2d Cir. 1998). For example, a court may consider "undisputed documents, such as a written contract attached to, or incorporated by reference in, the

complaint." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 234 (2d Cir. 2008)."

However, even if the documents are not attached to the complaint or incorporated by reference,

"a document upon which the complaint solely relies and which is integral to the complaint may

be considered." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007)."

Plaintiffs object to the inclusion of Defendants' self-serving "Knowledge Timeline" as

set forth on page 11 of the MTD [D.E. #22, p. 11] in its entirety, as same omits key facts related

to the transaction between CCGI, 350 Holdings and 350 Green and, significantly, omits facts

related to Defendants' actions during the audit period, including Defendants' purposeful

misrepresentation of key financial data, which is the subject Plaintiff's Amended Complaint.

Significantly, the "Timeline" misrepresents the Release language, alleging that same only

reserved "Plaintiffs' claims against JNS Holdings" [D.E. 22, p. 13].  As discussed above, the

Release was purposely limited in scope and only released Defendants from the New York Action

and Defendants' discussions related to any contract for the sale of the Chicago Assets to JNS

Power, neither of which are the subject of the instant action.

Plaintiffs' claims can easily be summed up as follows: Defendants concocted a scheme to

increase the value of their interests of 350 Green by purposefully failing to disclose pertinent

financial information or purposefully providing inaccurate information.  Defendants argue the

claims are barred because CCGI and 350 Holdings had certain "knowledge" of Defendants'

outstanding liabilities at the time the Exchange Agreements and First Addendum were executed.

However, as demonstrated herein, this purported "knowledge" that CCGI and 350 Green may

have had related to certain liabilities does not negate or contradict the actual claims made by

Plaintiffs in the currently pending Amended Complaint against Defendants.

Defendants MTD also contends that Plaintiffs' claims are somehow barred because CCGI and 350 Holdings had knowledge that Defendants were in discussions to sell the Chicago Assets to JNS Power and/or JNS Holdings. Specifically, in footnote 17 of the MTD [D.E. #22, p. 16], Defendants argue that Plaintiffs have taken a contrary position in that the Amended Complaint states that the Chicago Assets and liabilities were included in the Exchange Agreement (Amended Complaint ¶38) and the Addendum acknowledges that Defendants and 350 Green sold the Chicago Assets to JNS Holdings. This assertion makes no sense and has no relationship to any of Plaintiffs' claims in the Amended Complaint. At the time that the parties entered into the Exchange Agreement, it is CCGI and 350 Holdings' position that the Chicago Assets were included in the purchase price. However, in another attempt to omit pertinent facts from this Court, ¶5 of the First Addendum states that "CCGI contends any contract between 350 and JNS to be void and/or voidable as a matter of law as well as both a breach of the Exchange Agreement and in direct violation of the Term Sheet entered into between CCGI and 350 in August 2012 (the "August Term Sheet")," which position is evidenced by the Chicago Action and subsequent appeal. In any event, the knowledge that Defendants improperly sold the Chicago Assets to JNS Holdings has no effect on Plaintiffs' underlying argument which is Defendants intentional misstatements as to the liabilities of the Chicago Project which 350 Green was ultimately saddled with and which caused Plaintiffs to suffer pecuniary damages.

In support of this latest argument, Defendants cite the Declaration of Michael D. Farkas that was submitted in the New York Action (Defendant's RJN, Exhibit B [D.E. #24-2]). However, the February 11 2013 press release which is referenced in Mr. Farkas' affidavit only further demonstrates Defendants' pattern of deceit, where it states:

> 18. As a result of the FBI raid and CCGI's conversations with grant agencies regarding 350 Green's improper accounting and invoicing

procedures, the August Term Sheet further increased the damage award from fifteen percent (15%) to twenty-five percent (25%) of the then issued and outstanding membership interests of 350 Green if the terms of Paragraph Nine (9) of the August Term Sheet was violated by 350 Green as well as, under Paragraph Seven (7), an Exclusivity provision that had not been present in the July Term Sheet which prohibited 350 Green from taking, directly or indirectly, any action to initiate, solicit, negotiate or accept any offer from any person to sell 350 Green.

Defendants argue that when they entered into the letter of intent with JNS Holdings in February, 2013, which was a clear violation of the terms of the August Term Sheet, knowledge was somehow imparted upon CCGI and 350 Holdings as it relates to Defendants' purposeful misrepresentations of certain financial information. As set forth in the Amended Complaint, Defendants refused to provide a copy of the APA to CCGI and 350 Holdings until after they executed the First Addendum (Amended Complaint, ¶39). Therefore, the fact that CCGI and 350 Holdings knew of the existence of an alleged agreement between 350 Green and JNS prior to the execution of the First Addendum (without any knowledge whatsoever of any of its terms) has no bearing on the allegations that Defendants purposefully provided false financial data to CCGI and 350 Holdings before and after the execution of the First Addendum.

The Release did not release Defendants from the claims at bar but from potential claims related to the New York Action. The fact that CCGI and 350 Holdings may have been provided certain financial documents from Defendants during the due diligence period and the fact that CCGI and 350 Holdings were permitted to audit 350 Green's financials do not negate the allegations that the underlying financial documents that were provided by Defendants to CCGI and 350 Holdings (or to their auditors) to rely on (and which they did, in fact, did rely on) were purposefully inaccurate.

        *d.*   *350 Green's Outstanding Liabilities/Efacec*

Defendants then focus their argument on 350 Green's debt to Efacec USA ("Efacec"). Defendants represented that the outstanding liabilities to Efacec in the Exchange Agreement were only $690,000, not the $2,414,807.00 claimed by Efacec. In their "Timeline" on page 11 of their Motion to Dismiss, Defendants allege that on April 16, 2012, Efacec gave notice to 350 Green that it was terminating its agreements with 350 Green and demanding over $2,000,000 in damages. This allegation is supported by the self-serving affidavit of Defendants' attorney, Frank Pepler, Esq., and which contains (i) correspondence dated August 16, 2012 from Efacec addressed to Defendants containing a demand of approximately two million dollars that Efacec claimed was due from 350 Green [D.E. #23-1] (the "8/16 Letter"); (ii) correspondence dated September 11, 2012 from Efacec's counsel, Robert West, to Defendants' counsel, John Pierce, relating to 350 Green's outstanding debt [D.E. #23-2] (the "9/11 Letter"); and (iii) correspondence dated November 2, 2012 from Mr. Farkas on behalf of 350 Green to Mr. West [D.E. #23-3] (the "11/2 Letter", which, together with the 8/16 Letter and 9/11 Letter are referred to collectively as the "Letters"). The 11/2 Letter serves only to demonstrate that it was CCGI's understanding that 350 Green's debt to Efacec was $1,000,000. Moreover, there is no representation that the 9/11 Letter, relating to 350 Green's outstanding debt [D.E. 23-2] was ever provided to CCCI or 350 Green.

Defendants cite *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2nd Cir. 1991), which stands for the narrow proposition that where plaintiff has actual notice of all the information in the defendant's papers and has relied upon these documents in framing the complaint, then a court can consider such documents in a 12(b)(6) motion to dismiss. While CCGI acknowledges that it sent the 11/2 Letter, it is procedurally improper for this Court to rely upon Mr. Pepler's Affidavit and the Letters when considering the MTD, as they (i) are not relied

upon or referenced in the Amended Complaint; (ii) are not public records; and (iii) are not an integral part of the Amended Complaint. Defendants have not shown in their MTD that the requirements of *Cortec* have been met with regards to the Letters. At minimum, these Letters: (i) create an issue of fact as to what Defendants actually represented to CCGI and 350 Holdings as it related to the Efacec liability (as it was Defendants that made the final representation in the Exchange Agreement that the existing liability was $690,000.00) ; and (ii) have the effect of requiring additional testimony and argument as they relate to the claims and defenses in this matter. *Chiaramonte v. Animal Med. Ctr.*, 2014 U.S. Dist. LEXIS 99930, *10 (S.D.N.Y. 2014).

What is most telling about Defendants' argument in this regard is **that Defendants fail to address any of the other disputed liabilities that are set forth in Exhibit A of the Amended Complaint.** Removing Efacec entirely from the spreadsheet attached as Exhibit A of the Amended Complaint would change the total outstanding liabilities amount listed in the Exchange Agreement to $892,337.44 and would change the actual amounts claimed by creditors to $1,141,859.48. The difference in the vendor amounts from what was represented in the Exchange Agreement to the actual amounts would still be $249,522.04.

### e. *350 Green has Standing to Pursue Claims*

In the Amended Complaint, Plaintiffs allege that part of the damages that were sustained as a result of the Defendants' actions relates to the fact that CCGI is burdened with 350 Green's liabilities from an accounting perspective, which has a negative impact of decreasing the value of CCGI stock, harmed CCGI's growth, effected CCGI's credit rating and ability to obtain government grants and impede CCGI's ability to be listed on the NASDAQ exchange. (Amended Complaint, ¶56). Defendants argue that CCGI's SEC disclosures preclude the collection of damages based on these allegations. Specifically, Defendants attach a copy of CCGI's 2014 Q2

10-Q form [D.E. # 24-6, RJN Exhibit D], and allege that the reason that Defendants believe CCGI could not get listed on the NASDAQ is found in one line out of a 150 page document which states: "[t]hrough June 30, 2014, the Company has incurred an accumulated deficiency since inception of $56,882,107," [D.E. # 24-6, RJN Exhibit D, p. 37]. This statement is clearly not dispositive on the issue of CCGI's ability to become listed on the NASDAQ exchange, or on any of the other allegations that Plaintiffs set forth in Paragraph 56 of the Amended Complaint. Defendants then cite a further portion of the 10-Q which states "Although management believes that the Company has access to capital resources, there are currently no commitments in place for new financing at this time, and there is no assurance that the Company will be able to obtain funds on commercially acceptable terms, if at all" [D.E. # 24-6, RJN Exhibit D, p. 37]. Logic dictates that if accounting rules require CCGI to carry 350 Green's liabilities which results in a downgrading of CCGI's credit rating and causes CCGI to be unable to obtain government grants, all of which Plaintiffs allege in the Amended Complaint (¶56, ¶82), CCGI would have a difficult time raising additional investment, which is *exactly* what is reflected in the 10-Q upon which Defendants rely.

Moreover, although mentioned in passing, Defendants completely ignore the Plaintiffs' allegations that accounting rules require CCGI to carry 350 Green's liabilities on its books even though the entity was sold to a mortgage trust. At minimum, this Court would need to consider expert testimony as to general accounting principles, testimony related to CCGI's credit rating and expert testimony relating to the requirements of listing a company on the NASDAQ exchange. All of the foregoing is outside the scope of the instant MTD and requires that Defendants motion be denied in its entirety as a matter of law.

*f. CCGI has not Paid Defendants*

Defendants, once again, attempt to mislead the Court when they state that "Defendants have only been paid $140,000 of the $1,250,000 purchase price promised under the Exchange Agreement and Addendum" [D.E. #22, p 24]. CCGI acknowledges that it only paid Defendants $140,000 of the $500,000 balance due pursuant to the First Addendum, as the remaining balance has not been paid due to Defendants' unscrupulous actions. On May 7, 2013, CCGI issued to Defendants all of the outstanding shares that were due and owing pursuant to the terms of the First Addendum. The current price of CCGI stock is wholly irrelevant to the action at bar.

### g. *350 Green and the Trust Mortgage*

Defendants would have this Court question as to whether Plaintiffs have standing to assert claims on behalf of CCGI because 350 Green was subsequently put into a Trust Mortgage. Defendants rely entirely on speculation ("it is difficult to imagine how 350 Green could retain the causes of action asserted" D.E. #22, p. 21). However, Defendants cite no case law in support of their assumptions. 350 Green has every right to assert a claim for Breach of Fiduciary Duty against Defendants. In fact, the allegations set forth in Count VII are, in part, related to the recent federal indictment of the Defendants (Amended Complaint, ¶145-146). Defendants' attempt to question the issue of 350 Green's standing without any cited legal authority or factual basis should be ignored by this Court and disregarded as a matter of law.

### h. *350 Green's Creditors*

Finally, without legal or factual basis, Defendants dispute that CCGI is burdened with 350 Green's liabilities as alleged by Plaintiffs (which disputed contention is, of course, not a legal but a factual issue). Again, Defendants completely disregard the allegations that general accounting rules require same (Amended Complaint ¶56) and then conclude with the self-serving statement (notably without any factual support) that "if neither 350 Green nor the other Plaintiffs

are paying their creditors, then Plaintiffs cannot have suffered damages as a result of 350 Green's continuing obligation to pay" [D.E.#22, p. 26]". Plaintiffs do not allege that 350 Green is not paying its creditors, and the payment of any creditors is an issue of fact that is improper for the instant motion to dismiss. Moreover, the 10-Q upon which Defendants rely demonstrates that CCGI suffered damages as a result of Defendants' actions, and states: "On August 8, 2014, 350 received a copy of a complaint filed by Sheetz, a former vendor of 350 Green alleging breach of contract an unjust enrichment. The complaint names 350 Green, 350 Holdings LLC and Car Charging Group, Inc. in separate breach of contract counts and names all three entities together in an unjust enrichment claim." Therefore, there are clear issues of fact related to the liabilities of 350 Green and their effect on CCGI and, Defendants' Motion to Dismiss should be denied.

## IV.  Conclusion

Defendants purposefully misrepresented critical financial information related to 350 Green's outstanding liabilities to CCGI and 350 Holdings to cause CCGI and 350 Holdings to rely on such misrepresentations, and close the Transaction, paying Defendants an inflated price for their member interests in 350 Green. Plaintiffs relied on Defendants' intentional misrepresentations to their pecuniary detriment. The limited scope of the Release that Defendants rely upon does not cover the claims set forth in the Amended Complaint. Even assuming *arguendo*, it would be covered, under applicable Florida law a party may seek to invalidate releases procured by fraud, as Plaintiffs seek to do. Defendants do not meet their legal requirement to establish that no justiciable issues of fact remain and rely heavily on matters outside the four corners of the Amended Complaint. As a result, Defendants' Motion to Dismiss should be denied in its entirety as a matter of law, and Plaintiffs should be able to continue prosecuting their claims against the Defendants.

Dated: Miami Beach, Florida
      May 11, 2015

By: */s/ Michael I. Bernstein, Esq.*
Michael I. Bernstein, Esq. (mb3203)
THE BERNSTEIN LAW FIRM
*Counsel for Defendants*
1580 Ocean Ave, Brooklyn, NY 11230
Tel. (718) 475-5603
Fax. (718) 252-7685

1688 Meridian Avenue, Suite #418
Miami Beach, Florida 33139
Tel. (305) 672-9544
Fax. (305) 672-4572
e-mail: michael@bernstein-lawfirm.com

## <u>CERTIFICATION OF SERVICE</u>

       I certify that on May 11, 2015, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s Michael I. Bernstein, Esq.*

**Service List**

*Car Charging Group, Inc. et al., v. Mariana Gerzanych and Timothy Mason,*
Civil Action No.: 13-cv-08755-KPF
United States District Court, Southern District of New York

Cary Samowitz, Esq.
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4659
cary.samowitz@dlapiper.com

Frank T. Pepler, Esq.
555 Mission Street, Suite 2400
San Francisco, CA 9410-2933
(415) 836-2500
Frank.pepler@dlapiper.com
Admitted *Pro Hac Vice*

*Counsel for Defendants*